Good morning. Good morning, Carol. May it please the Court, I am Shannon Seibert, representing an appellant and plaintiff, DeSoto Taxi Cab Company, doing business as Flywheel Taxi. We are here on appeal following a cause of action in which, or a single cause of action case, in which we seek to overturn the PUC's, or have declared invalid, the PUC's singular act of September 2013, in which they exercised jurisdiction over some, but not all, taxis. Roberts, why wouldn't it satisfy the rational basis test to distinguish in regulation of, I'll call them both taxis just for convenience, taxis that you can, that a person can hail on the street from taxis where you have to call them and ask them to come get you? Why isn't that a rational basis? Well, two reasons. It's arbitrary and irrational because, number one, especially in 2013, when the regulation or when the jurisdiction was exercised, there was no requirement. I don't understand why it's irrational. The thing about a taxi you can call is before you're in the cab with the door closed, you can agree upon a price. And when you hail a taxi, you don't know anything until you're there. But in 2013, that wasn't the circumstance. Number one, Uber and Lyft and Sidecar at the time were actually taking street hails as a matter of course, maybe not as a matter of business policy, but they actually were, and there was no prohibition against them doing so because they were unregulated. Well, no, they were regulated. They were regulated by the State agency instead of the municipality. But they were regulated, and they were regulated as charter parties. So whether they violated the terms of their regulation as either a conventional taxi driver or an on-call pickup service might, they might violate the terms, but they were regulated. But that's precisely our point, is that they were not regulated until the PUC exercised jurisdiction on September 23, 2013.  I don't understand that. It looked to me like the California Constitution and statutes said regulation of charter parties is in the state agency. And that was there all along, and the only thing that that PUC, is that what it was, a state agency, PUC? CPUC. Whatever it is, a state agency. All it did was say charter party. That means they get hired before you get in the conveyance, and a price is agreed upon. So Uber is a charter party. And to finish precisely, and there are two reasons. Number one, Uber was, prior to the PUC saying they were charter party carriers, they weren't charter party carriers. They were taxis. Number two. Suppose I go out here on Market Street, and I prefer an Uber to a taxi for some reason. Or I just want the first thing I get. If I put my arm out, I can't see an Uber because he doesn't have the light on top. As a matter of fact, Your Honor, you can. They are required to have signage just like taxis are. They now, many of them now have advertisements. I don't know if you've seen them driving around San Francisco. They now have advertisements just like taxis. Uber has. Lyft has a pink taxi light essentially that says Lyft. I just spot an Uber, except that he pulls over and looks at you, and you say, oh, are you my Uber? Well, because the Uber has the Uber signage, as they're now required to by the PUC. You mean the little sticker in the window? Correct. In the front and the back. Yes. So if you have really good eyesight, you can spot an Uber. Well, it's supposed to be visible. But in 2013, as far as the pre-negotiation of any sort of price entering the destination, that wasn't even available in the Uber or the Lyft apps back then. So these facts that might differentiate the services today for the specific period in time that we're looking at, which is September of 2013, did not exist. There was go ahead. I'm sorry. Go ahead and finish your answer. I was going to say there was no appreciable difference between the services. Actually, they did. I used to have to travel to New York City a lot on some cases that I had in the 80s when I was still in practice. And you could either walk down a cross street to an avenue going in your direction, hail a cab, or you could call what they called then a limo company. And it was just like Uber, except you'd call them on the phone, except touching the screen of your iPhone. But you had to provide your destination. When you called those limousine companies in the 80s, you had to provide them the destination. That's part of the, specifically in California at least, that's part of being a charter product carrier. You have to have the entrance, the pickup point, and the destination. In 2013, Uber didn't even have the functionality to put the destination into the application. So that is, and that goes back to our point of there was no appreciable difference between the services offered by the two at the time the PUC exercised jurisdiction. Well, let's talk about that because the situation today, as I understand it, is that the California legislature has enacted new statutes, which appear to me to confirm the commission's decision to regulate these companies, TNCs, is that what they're technically known as? Yes. Okay. As charter parties. And you're not challenging the constitutionality of the legislative enactment, as I understand it. Is that correct? That is correct. Okay. So at this point, what difference does it make what happened in 2013? Were we to rule in your favor and somehow invalidate the 2013 commission decision, by virtue of the subsequent legislative enactment, our order would be of little effect, would it not? Because the commission will now continue to regulate these companies by virtue of their statutory authority. Assuming for the moment, for argument's sake, that it was ratified by the legislature, the ratification, the legislation that earliest, at the earliest, could have ratified it, excuse me, was passed by the California legislature in September of 2014, signed by the governor in October of 2014, took effect January 1, 2015. Fifteen. This, the PUC exercised jurisdiction arbitrarily and irrationally, we argue, in September of 2013. So a period of 15 months. Okay, but tell me, let me write the order here. What do you want us to order done in 2018 in light of legislative change? The fact that they have, so by them improperly exercising jurisdiction, for that 15-month period of time, they're essentially, Uber Lyft is essentially able to claim the protections of having been under the PUC's, excuse me, jurisdiction, even though they weren't regulated. You're not answering my question. I'm trying to, I'm sorry. What do you want us to do? What do you want the order to say? We've sought declaratory relief saying that it was an unconstituted, it was a violation of equal protection, it was an unconstitutional act by the PUC. Okay, and maybe you're right, maybe it was. But now there's a statute that permits or directs or authorizes or ratifies the commission's regulation of this part of the industry. And our order, because you're not challenging the constitution of the statute, isn't going to address on a going forward basis what the commission is currently doing today. So I guess maybe I'm really asking, I'm not sure whether it's a standing concern that I have or a mootness issue that we're dealing with. Redressability, I think. Yeah, redressability. I mean, what is it that I'm going to redress in the order that you want us to issue? And that's what I was unclearly trying to answer. Okay. Do you want some water? Thank you. Thank you very much. Okay. You can take it with you to the podium, I'm sorry. I think the point can be made, the San Francisco Superior Court, just January 30th of this year, issued a ruling on Indemur. It was a case brought by various private taxicab drivers and companies against Uber for unfair pricing in California under the Unfair Practices Act, which is below-cost pricing. It's kind of a corollary to antitrust, but not quite. It's the State. Under Business and Professions Code 17-024, there is an exclusion there for companies whose rates are set under the jurisdiction of the Public Utilities Commission. Right. We also, by the way, have, which wasn't related, we thought, but we also have a case against Uber, DeSoto Cab does, for unfair practices as well, but we're in Federal court. So the Unfair Practices Act, as it was applied by the San Francisco Superior Court, said that because they're under the jurisdiction, because Uber is under the jurisdiction of the PUC, there are any below-cost pricing during the statutory period, they are provided, they're exempted from liability based on Business and Professions Code 17-024. Now, that this opinion came out, or order came out 10 days ago, 13 days ago, but it's a really clear example of the redressability of the violation. Specifically ---- Roberts, I don't understand still. Let's say you win this case, and we decide that the commission was just flat wrong in treating Uber as a charter party in 2013. It's hard, at least for me, to understand what changes on the ground. I can still get an Uber on my iPhone. I can still hail a cab on the street. The state commission is still going to be regulating Uber. The municipality is still going to be regulating the taxis I hail on the street. I don't understand what the ---- and you can't get any damages, as far as I can tell. I don't know. Maybe you can, and you can explain it to me from Uber, because it acted as a charter party in 2013. I don't understand what happens on the ---- in the real world, in the concrete world, on account of you winning a declaratory judgment from us or something saying that the commission was wrong in 2013. Well, two things, and damages are specifically one of them, yes. I mean, DeSoto does have lawsuits. What were the damages before? Before, well, below-cost pricing under the Unfair Practices Act in California. And you're suing the CPUC. I'm sorry? The suit against the California Public Utilities Commission. DeSoto also has a lawsuit against Uber specifically, and it was filed November of 2016, so the statute goes back to November of 2012. So you're saying you would get damages from Uber and the commission or at least one of them? From Uber. Because Uber was too cheap compared to taxis, then, on account of it. For their below-cost pricing. And in this case, assuming the ratification would be from November 2012 through December 31st of 2014, if the district court follows the California, the superior court's order regarding this exemption for Uber because their rates are set under the jurisdiction of the PUC, that means that a declaratory relief at the PUC exercising jurisdiction in 2013 was unconstitutional, even if it were ratified. Well, then that gets back to the question that we started with at the beginning, which is, is this subject to rational basis review? And if the justification was charter party pre-authorized ride versus street hails, if we decide that that is a rational basis to make that determination, then the action in 2013, which was ratified by the legislature in 2014, would not be unconstitutional. According to the correct, in the complaint itself, I mean, this is a motion for judgment on the pleadings. We never even, discovery never opened. Right. So it's just purely pleadings. And in the complaint itself, we alleged accurately that both companies took street hails because, particularly in 2013, both companies did take street hails. We alleged that both companies also accepted assignments through the type of app or that Flywheel Taxi does now because they have the Flywheel app. So the allegations of the complaint, there is no rational basis for differentiating between the two companies with nearly identical characteristics. The stated basis of the PUC for doing so was, you know, promoting safety of the public. But in stepping in, occupying the field, and stopping the local agency, the MTA, from regulating, they essentially made the public less safe. And therefore, that goes to the pretext. How does, suppose you do find evidence that if somebody stands out there at the corner of 7th and Market and holds his arm out, an Uber may stop for him before a cab comes along. Suppose you can prove that. You get it to summary judgment, and you've got a bunch of appliances. I still don't understand how that eliminates the rational basis for regulating charter parties and taxis in different places. Because what's happening then is the Uber driver is cheating. They're supposed to act as a charter party carrier, and they're not. They're acting as a street hail carrier. I don't see why the cheating, though, affects who is the appropriate regulator. But in September 2013, the law didn't exist, so they weren't necessarily cheating. I mean, the prohibition against taking street hails on charter party carriers? Oh, yeah, sure they were cheating. I mean, the municipality says if you take street hails, you've got to get a medallion from the municipality. Precisely. And the MTA had started exercising jurisdiction over it. I mean, Uber called itself Uber Cab when it was formed. It only stopped calling itself Uber Cab because the MTA said, hey, if you're a taxi, you have to go through this procedure. They were violating things left and right, including taking street hails. I don't really see why the name matters. I mean, I remember in New York in the 80s, they called it Tel Aviv Limousine Company. And it wasn't a limousine. It was just you call them first and tell them to pick you up instead of street hailing. Right. The name, I'm not saying that that's determinative. I'm saying that that is an example of the numerous ways that Uber was violating the local rules, the MTA regulations regarding providing taxi service. Are you still asking us to, in essence, overrule the commission's authority to regulate these companies and, in essence, issue a declaratory ruling that says that they have to be regulated by the MTAs? In light of the cases that the Court brought to the party's light regarding ratification, I think that declaratory relief is still available under the Constitution. And I think that is appropriate. I mean, how could we enter an order in violation of the California Constitution? In violation of the Equal Protection Act. If we ordered, if in essence we reversed the commission's decision and ordered Uber and Lyft to be regulated by local municipalities. The commission doesn't have the ability to determine its own jurisdiction. That's not within even the California Constitution. The legislature has done that for it, has it not? The legislature has recognized that it exercised jurisdiction. It didn't specifically say we're codifying this. It did absolutely recognize it. But even so, we have this 13-month, 15-month period, excuse me, between September of 13 and January of 2015, in which the legend, the PUC acted outside of the Constitution, in violation of the Constitution. And the Court in the Yeoman, if I may, one more? The Yeoman case that the Court brought to our attention, they specifically state that if an administrative act is unconstitutional, the fact that it is ratified or codified later, if that fits within the required procedures, then great. From that moment of ratification or codification forward, it's valid. But it does not validate, it does not go and vacate the validation. So you're asking if we do this, it opens you up for the possibility of collecting damages from the 2013 to the ratification of the possible ratification? Correct, Your Honor. Yes. That's the whole point. But I guess I'm bothered by Judge Kleinfeld's point that if it is illegal in 2013 for Uber drivers to be doing this because they don't have medallions and they have not complied with all of the local requirements regulating the taxi industry, how a court could award damages for a violation of law by the drivers? Are you talking about in this particular, in the instant lawsuit? Well, I'm just, it seems to me a perverse result that we would award damages as because, as I understand, the Uber arrangement, they get paid through the discount that they take from whatever your credit card gets charged. The damages, we're not seeking damages in this suit. No, no, I understand. Right. The damages that are being sought in the suit against Uber are not for the individuals taking the, or not for the street hails. Right. They are for the entire practice of under-cost pricing. I think that answers my question. Thank you. Thank you. All right. We will hear from the other side. Morning, Your Honors. Jonathan Colts for the Public Utilities Commission. May it please the Court. I'd like to focus on the standing issue because I think that's probably dispositive here. As I understand my colleague's redressability argument as it currently stands, I think the theory goes that they have a lawsuit pending against Uber. I believe that's in the Northern District before Judge White. And so they want to hold out the possibility of getting damages in that suit for that 15-month period from September of 2013 to January of 2015. And with respect to my colleague, that seems awfully speculative to me. They haven't won that lawsuit. I'm not sure where that suit is in the process. I'm not sure that you can hang Article III standing on the possibility of maybe getting damages against another party in another case if everything goes your way. Why wouldn't that be good enough for a declaratory judgment? You get the declaratory judgment in Case 1, and then based on that declaration of what the law is, you get damages in Case 2. If they have to be in one case, consolidate them. I suppose I'm not... It feels very speculative to me, Your Honor. I think redressability needs to be somewhat more certain than that. But if the theory is unfair pricing competition, because had the TNCs been subject to the same pricing restrictions imposed on taxicabs, then the TNCs couldn't undercut the taxi rates, the flag drop, and so on, that the taxicab companies must adhere to at any time of the day or night without regard to surge policies or surge pricing and that sort of thing. I mean, it seems to me that that could be an ascertainable damages amount depending on how good the records are for that time period. And maybe, but we don't know what the records are for that time. I mean, this is, frankly, this other case... It makes it hard. It just means dueling economists at the trial. Right. Yeah, I mean... And forensic accountants. Yeah. I just don't know. I mean, this is the first time in this case that their suit against Uber has come up. I happen to know about it because I've been following the case. Sure. But it's not in the record. It was never raised before the district court. This argument is the first time that it's come up here. Well, the request for declaratory relief was based on a challenge to the commission's assumption when it took jurisdiction that these TNCs were more like charter parties because you had to sign up in advance and pre-authorize or pre-request the ride. Yeah. But as I heard Ms. Siebert's argument, she's saying, well, that may be true for the majority of the Uber drivers during that period of time, but apparently Uber either wasn't enforcing or didn't have in its driver agreement any prohibition on picking up street hails. And she alleges in this complaint that they actually were, in fact, doing that during that 15-month period of time. Well, then I think it's important to go back to the rational basis standard. And, of course, rational basis, the legislative classification isn't subject to courtroom fact-finding. It can be based on rational speculation unsupported by evidence. Even if they're wrong, that's still a rational basis? That's an interesting question. I hadn't thought about that before. I think under Nordlinger v. Hahn, under the standard set forth there, the facts apparently relied on by the legislature or, in this case, the agency sitting in a quasi-legislative role. We have to have been able to rationally believe the legislative facts to be true. I'm not sure that means they have to. The legislature gets things wrong. I mean, and the CPUC gets things wrong. Would that we didn't, but alas. And if it were the case that we had to be perfectly correct 100% of the time, I'm not sure how much we would get done. So I think even on the basis of this record and even on the basis of the pleadings, it's my belief that Flywheel hasn't overcome the presumption that the legislative facts we relied on could rationally have been believed to be true at the time. There was nothing in our record, in the CPUC's record, about TNCs taking street hails. And, in fact, the SFMTA, Flywheel's regulator, and the entity that they claim should be regulating Uber and Lyft here, came before the CPUC and said, no, these entities are more like charter party carriers. I thought that was what the record said, too, that they were not ride hail. Correct. I'm having trouble, more and more trouble, actually, seeing why it matters whether some Uber drivers took street hails. I must be getting lost in the details. But it seems like, as Judge Tallman developed in his line of questioning, Uber doesn't get the money if some driver takes a street hail. The passenger never calls Uber on his cell phone or uses the app to tap on Uber. It seems like it's got to be just some person that drives for Uber and also drives on his own account. And when he sees somebody trying to hail a cab, he tries to get there first. And what he's doing is violating municipal law. It's probably a misdemeanor. And he's driving a cab, at least for that ride, and maybe he's doing it all the time without a medallion, which violates municipal law. I don't see where it has anything to do with the state regulatory agency. What am I missing? I'm getting confused here. Respectfully, Your Honor, you're not missing a thing. I agree 100%. As I said in my brief, or as we said in our brief, let's step aside from TNCs for the moment. Let's say we have a UPS driver. And let's say that— Could you talk—UPS, I understand. In the previous one, I missed the acronym. I was still translating. The TNC. The charter. The state regulatory agency. The TNCs are what they call these Uber Lyfts. Charter. Correct. I apologize. I'll call them Uber from now on. That's easier to remember. Let's take a UPS driver, and let's say the UPS driver starts selling ice cream out of his truck. Not supposed to do that. I'm pretty sure anyway. I don't think that means that the government has to now regulate UPS as, like, Mr. Softee. It just means that that driver is breaking the rules. And so the same thing here. I don't think that Flywheel has stated in court below the district, before the district court, that TNC, Uber, Lyft, had a policy of encouraging drivers to take street hails. I'm sorry. They did not say that. Flywheel did not say that in the record? Or did they say that in the record? I believe they did, Your Honor, yes. That there was a policy of Ubers taking ride hails? Correct. Okay. And it's my belief, Your Honor, that that's not a plausible allegation because of the way the business works. Uber and Lyft only get money if you use the app. If you ride hail an Uber and you get in the car, the driver doesn't know if he's going to get paid. You can just get off and leave when you get to your place because they get paid through the app. That's my understanding, yes, Your Honor. So it's their problem if they do a ride hail. Right. So, Your Honor, if— It's like working off the books, right? Essentially. Well, it may not even get paid. But if he takes a street hail, he's got to take cash, right? Because he can't— if he runs it through the credit card, there's no way to do that because the guy wasn't— the fare wasn't previously enrolled in the Uber or Lyft or sidecar app. That's my understanding as well. Hey, imagine it must work the way it used to work in Russia after 1991 or 2. You try to get a cab. There are no cabs. And some guy stops in his car and says, Where are you going? And you tell him, Hotel so-and-so. And he says, So many rubles. And it's just between you and him. Is that what we're talking about? I would have to believe so. I'm not— I'm not aware— I can't conceive of any way that it would make sense as a business policy for Uber and Lyft to encourage their drivers to take rides off the books. They wouldn't make any money, right? That's right. The way I understand, though, the record is that Flywheel or DeSoto said that in 2013 that Uber was operating as a taxi. The record, though, that you had showed something different entirely. CPUC relied on the fact that they were not a ride-ale company, but were a charter. Is that right? That's right, Your Honor. So if we take that as true— I mean, so you got it wrong, but that's the facts that you used for CPUC, then there's a rational basis for regulating the TNCs and the taxis differently, the charters and the taxis differently. That's right, Your Honor. Is that your position? That's correct. Whether somebody arbitrarily ride-hails or not. Yes, Your Honor. Your Honors, if the Court has no further questions— Anybody have anything further? I don't think so. Thank you. Okay. Thank you very much. Yes. I will give you two minutes on rebuttal. I just wanted to address this question that seems to be really weighing on everybody about why would Uber do this. It's not part of their business model. They're not making money. And this is a bit of a crossover with the lawsuit that DeSoto has against Uber. They did do it. They were encouraging it, and they allowed it because they wanted to— But what— Make money? Yeah. Oh, go ahead. Yeah. They're trying to destroy the taxi industry. That's why. Right. I mean, it was stated by Mr. Kalanick. But how do you respond to his argument, which I think has support in the case law, that if the administrative agency, in this case, which has fact-finding authority under its enabling charter, makes a factual determination and reasonably believes that there is a distinction here between ride hails and preauthorized rides, and therefore decides to exercise its authority to regulate these companies, how can we overturn that as not based on a rational basis, good-faith belief in the facts that the commission determines? Because it wasn't based on— Number one, it wasn't based on the fact-finding ability of the PUC. The PUC interpreted the statute, the prearranged. And again, that's a matter of law for courts to decide, not the agency interpretation. But I thought there was an original— I don't know if you'd call it an ALJ order. I'm not familiar enough with how the commission compiles its record. But I thought I read in the record some sort of a ruling by one of the commissioners, which kind of looked like an administrative law judge finding, and then it goes up to the full commission, which, in reliance on that, what I would call agency fact-finding, makes the decision for the commission that it will exercise jurisdiction. Have I got the procedural history right? Yes. With regard to the actual fact-finding part of it, but with regard to the interpretation of the statute, which is what we're talking about, we're talking about the prearranged. I mean, the statute of prearranged says it has to be done by telephone or contract, written contract. Right. It is very much, you know— But the CPUC used those facts. They found, as a fact-finder, that that's what it was, a charter company, that they used an app and they prearranged and gave a destination. Isn't that what they found? Well, they stated— It's controverted by you, I understand, but that's what they found. Well, did the actual order itself find that? No. They stated that they were — that basically they said that because the — their findings and justification in this aspect was the fact it was an interestingly worded statement of basically because an application was downloaded and that was therefore prearranged. You gave a destination. Exactly. The destination — actually, they didn't say the destination at that time because destination, again, wasn't provided for in the Uber app in 2013. So— Yeah, absolutely. When it comes to the constitutionality, do you have a question? Yes, I do. I'm sorry. I'm thinking more about the plausibility of your contention that part of Uber's strategy was for the drivers to take street hails, even though they're not supposed to. And what I can't figure out is how that could be plausible because how could Uber make any money? The drivers — it doesn't go through the app. So Uber doesn't get to charge the passenger's credit card. Uber doesn't even know about it. The driver's working off the books. And if Uber doesn't make any money, why would it be Uber's policy to do that? Uber's policy from the very beginning has been to destroy the taxi industry. I mean, Mr. Kalanick has been out in public stating this. I don't think the complaint says that its purposes and policy is to destroy the industry. That — It does not? What the complaint does say is that — How could they make — could you answer my question? How could they make money? By becoming a — by monopolizing the industry. No. By destroying the taxi industry. How could they make money by having it as their policy for drivers to take off the books app or off the book sales where they don't make money? In those individual instances in 2012-13, of course they're not going to make money on the individuals — on those individual rides just like they don't make money on most of their rides because they price below cost, which is all — that's part of the monopolization of antitrust law is you can't — you can't price below cost. But we're not — we're not dealing with that now. We're not. I'm simply — But are you saying that in 2013 that Uber did not have an app policy and they did not have a policy of giving a destination? Correct. You couldn't put the destination in 2013. And there was no app in 2013? There was an app, yes. You couldn't put the destination in. But what I'm responding to is the court's concern over this doesn't make sense with Uber's business model. It still makes no sense to me. Economists have been agreed for decades that underpricing to destroy competition and create a monopoly never works because once the monopoly pricing sets in, new entrants come into the market and it's just the same as it was before. When there are low barriers to entry. This is a market with very high barriers to entry. I can't think of a lower barriers to entry market than, hey, I'll take you there, 10 bucks. The apps cost millions and millions and millions of dollars to develop. It is a very high barrier. Well, you do it without an app. You just cruise around on places where there are a lot of people who try and get cams, just the way cam drivers do. What do I need an app for? I know lots of people are going to be trying to go from the Marriott to someplace that — The second barrier to entrance in that instance is the medallions, the $250,000 medallions that are required by the City of San Francisco. Either way, you have high barriers to entry, high financial barriers to entry, at the very least. The other big difference is the background checks and the fingerprinting. I'm sorry? The other big difference is background checks and fingerprintings for the taxi drivers which they don't have for the Ubers. They do now, but in 2013, they didn't. In most states, they don't. I'm sorry? Most states, they don't. In most states? Correct, yeah. I mean, it's very much kind of a hodgepodge of regulation how this is happening right now. But again, I mean, that is part of our — transportation coming along. So, Ms. Siebert, I'm looking at the commission's order, ER 208 through 214, which is pages 64 through 70 of the commission's order. I don't have it in front of me. I'm sorry. It does refer to the fact that they assigned a commissioner, Michael R. Peavy, and an administrative law judge, Robert Mason III. And then there are seven pages of findings of fact, which includes a finding that the TNCs basically do not hail — drivers, you know, cannot be hailed on the street, similar to a taxicab. So, if the commission made that finding and, in good faith, relied on that factual finding, how can we simply accept your allegation challenging that finding as a basis to overturn the commission's 2013? Well, and that's where the pretext comes in. As far as what was alleged in our complaint and why we think we should be able to amend your allegation. But I don't think we can do the pretext. I'm sorry? I don't see how we can talk about a pretext. Well, when they — when a defendant — when the defendant provides a stated reason for having engaged in an action, and you can prove that that stated reason is false, that it's just completely false, it's not based on reality, they're giving a false reason. But I don't think we have a record for that, do we? We do. It is alluded to in the complaint. It's a vague allusion. It is a vague allusion, absolutely. If they paid off — if they paid off the — Undue influence. Undue influence, yes. Then Uber must have paid off the commission. The commission. Is that where we're going with this? That is one absolute possibility, Your Honor, as far as undue influence on the commissioners. They didn't plead that. They wanted to say, if you give us a chance, we'll do that. Right. Well, in addition, the commissioner, the PUC itself, stated that it was to increase public safety. The PUC, by taking the action that they took, decreased public safety because they were — they essentially created a period where Uber, Lyft, Sidecar were acting without any regulation when the MTA had tried to. And again, these companies started in San Francisco. And so, San Francisco MTA local agency had started to exercise jurisdiction over them as taxicabs. They had sent a cease and desist letter. And by the PUC stepping in, that is how they basically ended up providing them free rein for this period of time to operate with no regulation before 2013 through 15, at least, where they're operating with very little regulation under the PUC. Okay. I think we have your argument well in hand. Thank you very much. Thank you. Thank you very much. The case just argued is submitted. Thank you both for your arguments. They were very helpful. A real pleasure. Thank you.
judges: Kleinfeld, Tallman, Jack